## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

Southern Country Farms, Inc., a West Virginia
Corporation, individually, and on behalf of all
individuals and legal entities similarly situated,

        Plaintiff

vs.

TH Exploration, LLC, TH Exploration II,
LLC, and Tug Hill Operating, LLC,

        Defendants

> ELECTRONICALLY
> FILED
> **06/03/2021**
> U.S. DISTRICT COURT
> Northern District of WV

Case No.:_____  **5:21-CV-84 (Bailey)**

## COMPLAINT

COMES NOW Southern Country Farms, Inc., individually, and as a representative of those individuals, entities, companies similarly situated (the "putative Class") and for its complaint states as follows:

### I.

### PARTIES

1.  Southern Country Farms, Inc. ("Southern County") is a West Virginia Corporation authorized to do business in the state of West Virginia and owns substantial oil and gas interests in West Virginia and owns property in Marshall County, West Virginia.

2.  TH Exploration, LLC is a Texas limited liability company doing business in West Virginia with its principal place of business in Texas.

3.  TH Exploration II, LLC is a Texas limited liability company doing business in West Virginia with its principal place of business in Texas.

4.     Tug Hill Operating, LLC is a Texas limited liability company doing business in West Virginia with its principal place of business in Texas.

## II.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to:

a.  28 U.S.C. §1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs; and

b.  The Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d).  Upon information and belief, CAFA's requirements are satisfied in that (1) the members of the Class exceed 100; (2) the citizenship of at least one proposed Class member is different from that of the Defendants; and (3) the matter in controversy, after aggregating the claims of the Members of the putative Class, exceeds $5,000,000.00, exclusive of interest and costs

6.     This Court has personal jurisdiction over all defendants, each of which is doing business in the Northern District of West Virginia.

7.     Venue of this matter is proper in the Northern District of West Virginia. The property at issue in this case is situate in Marshall County, West Virginia within the Northern District of this Court.

## III.

## NATURE OF ACTION

8.     This suit is brought to recover for the underpayment of royalties and the payment for production owed pursuant to Oil & Gas Leases taken by TH Exploration, LLC, TH Exploration II, LLC and/or Tug Hill Operating, LLC, their predecessor, successor and affiliated entities

(collectively "Tug Hill") and to require that Tug Hill provide clear and accurate information to Southern Country showing the calculation of its royalties and payment for full production volumes.

## IV.

### SOUTHERN COUNTRY'S OIL & GAS LEASE

9.      Southern Country granted an Oil & Gas lease to Gastar Exploration USA, Inc. on January 18, 2008, covering 528.96 acres of land, more or less, located in Marshall County, West Virginia (the "Lease").  The Lease is recorded in Book 666, Page 489 of the Marshall County records.[1]  A copy is attached as Exhibit 1.

10.     The Lease was drafted by Gastar Exploration USA, Inc. ("Gastar").

11.     Through assignments, TH Exploration, LLC and TH Exploration II, LLC were/are successor lessees to the Lease.

12.     Paragraph 5 of Southern Country's Lease governs the royalties payable by Defendants to Southern Country and provides in pertinent part:

> **Royalty Payments:** The royalties reserved by Lessor, and which shall be paid by Lessee, are:
>
> (a) on oil (including but not limited to distillate and condensate) <u>One eighth (1/8)</u> of that produced and saved from the lease premises, the same to be delivered at the wells or to the credit of Lessor in the pipeline to which the wells may be connected, provided; however, Lessee, at its option, may from time to time purchase the royalty oil, paying not less than the price prevailing in the pricing area for oil of like grade and gravity at the time of delivery;
>
> (b) on gas, including casinghead gas and all other gaseous or vaporous substances, produced from the Land and sold or used off the lease premises or in the manufacture of gasoline or in the extraction of sulphur or any other product, the market value at the wells of <u>One-eighth (1/8)</u> of the gas sold or used, with the market value at the wells in no event to exceed the net proceeds received by

---

[1]    All recordation references are to the Marshall County, West Virginia records.

Lessee calculated or allocated back to the wells from which produced, making allowance and deduction for a fair and reasonable charge for gathering, compressing, and making the gas merchantable, provided, that on gas sold at the wells, the royalty shall be <u>One-eighth (1/8)</u> of the net proceeds received by the Lessee from the sale, all allowances and deductions, . . . .

**V.**

**SOUTHERN COUNTRY ROYALTY STATEMENTS**

13.    Through December 2014, Southern Country received its royalty statements and royalty checks from Gastar Exploration Texas, LP.

14.    From January 2015 through May 2016, Southern Country received its royalty statements and royalty checks from Gastar Exploration, Inc.

15.    Since June 2016, Southern Country has received its royalty statements and royalty checks from Tug Hill Operating, LLC.

16.    Upon information and belief, the royalty statements sent to Southern Country by Gastar and Tug Hill were/are deliberately misleading to intentionally conceal and obscure the volume of oil, gas and related mineral products produced from Southern Country's property, the price paid for the production and the costs deducted in connection with the royalty calculations.  They were and are intended to hide from Southern Country, and other royalty owners, the methods and transactions by which their mineral production is sold, and their royalties calculated.

17.    The Gastar and Tug Hill royalty statements were and are similar, though there are some minor differences.  Both contain columns purporting to show:

  a.   the type of product produced from each well,

  b.   the volume of each product produced each month,

  c.   the price for each product in the month sold,

  d.   the gross value determined by multiplying the volume by the price shown,

  e.   gross deductions,

  f. the net value of each product,

  g. Southern Country's royalty interest,

  h. the value to Southern Country, as the royalty owner, of the sale value of each product,

  i. Southern Country's supposed share of deductions (always shown as $0), and

  j. the net royalty value to Southern Country.

18. The Gastar statements classify the volumes produced from the Southern Country Lease as Oil, Gas, Condensate and Plant Products while the Tug Hill statements classify the volumes as Oil, Gas, and Liquids.  Neither Gastar nor Tug Hill define these classifications.

19. The Gastar royalty statements contain a column titled "Gross Deducts," but have never shown any amount in the "Gross Deducts" column.  The Tug Hill royalty statements contain a column titled "Deductions" and identify gross deductions for severance taxes, "REG" and Marketing.  There is no explanation of what constitutes REG or Marketing deductions.  Exemplars of the Gastar and Tug Hill royalty statements (appropriately redacted) are attached as Exhibits 2 and 3, respectively.

20. The Gastar royalty statements appear to indicate, by implication, that no deductions are allocated to Southern Country.  The Tug Hill royalty statements, in contrast, have columns specifically showing no deductions allocated to Southern Country and mathematical calculations using the numbers shown on the statements appear to confirm that none of the gross deductions reflected on the statements are allocated to Southern Country.

21. Beginning February 2021, Tug Hill changed the format of its royalty statement.  It no longer shows a price for the products produced.  It shows the purported volume of Oil, Gas and Liquids produced from each well and provides a "Gross" and "net" number which are identical.  It does not contain columns for deductions, but has columns titled "Compt" and "Compt Amount,"

which are not explained.  An Exemplar of these royalty statements (appropriately redacted) is attached as Exhibit 4.

22.     The foregoing royalty statements were and are submitted by Gastar and Tug Hill to Southern Country as the sole explanation of the volume and value of all oil, gas and associated products produced and sold under the Southern Country Lease and the costs that have been and are being assessed against Southern Country and deducted from its royalty payment  As a matter of West Virginia law, the royalty statements prepared by Gastar and Tug Hill were and are required to permit a royalty owner to easily discern the costs actually incurred and determine that the costs are fair and reasonable.  *See generally*, syllabus pt. 5, *Wellman v. Energy Resources, Inc.*, 210 W.Va. 200 (2001) 557 S.E.2d 254, 152 Oil & Gas Rep. 178 (2001).   Additionally, proper deductions from royalty payments must be linked to specific language in the lease allowing the costs to be allocated between the lessor and lessee.

23.     Gastar and Tug Hill intended that Southern Country would rely on, and Southern Country did rely on, the information provided in the royalty statements as showing the volume of the production under its Lease, how its royalty was calculated and the correctness of the calculation under the terms of the Lease.  However, upon information and belief, material information in the statements is incorrect or misleading, such that the statements as a whole are incorrect or misleading.

24.     Upon information and belief, Gastar and Tug Hill entered into an agreement with another entity, supposedly a third-party purchaser, to allegedly "buy" the production from wells drilled pursuant to or in connection with the Southern Country Lease.  The alleged third-party purchaser then entered into a separate agreement or agreements with another entity or entities to gather, transport and process the oil and gas production from the Southern Country Lease.   Upon

information and belief, the gathering, transportation and processing agreement(s) charged certain fees based on the volume of production and also provided that a certain percentage of the products processed from the production from the Southern Country Lease would be retained by the processing entity.  The alleged third-party purchaser would then pay Gastar and Tug Hill the amount it received under these agreements less an additional fee.  This amount would indirectly include, and thereby pass on to Southern Country and the other royalty owners, various costs and reduce the net volume of the oil, gas and associated products produced from the Southern Country Lease.  None of this information is revealed in the royalty statements sent to Southern Country.

25.    Upon information and belief, these agreements are not true third-party arms-length agreements.

26.    Upon information and belief, the volumes shown on the royalty statements do not include the volumes retained by the processing entity.

27.    Upon information and belief, the prices shown on the royalty statements are not the prevailing market price or the gross price under the agreement entered into with the alleged third-party purchaser or any of the gathering, transportation and processing agreements.  Upon information and belief, it is a number calculated by Gastar and/or Tug Hill that includes, and is intended to hide, reduced volumes and various sums of money improperly taken by Gastar and Tug Hill before calculating Southern Country's royalty.  For example, in the September 25, 2017 statement, attached as part of Exhibit 3, the price for Liquids sold in July 2017 shown by Tug Hill is $0.27, but the Mt. Belvieu price per gallon for a composite barrel of NGLs on July 1, 2017 was $0.5828.

28.    The foregoing conduct reduces the amount of royalty proceeds that should be paid to Southern Country and all individuals and legal entities similarly situated

29.     By letter dated March 1, 2021, Southern Country gave notice to Tug Hill that the royalty

statements were incomplete and/or misleading and that it believed its royalty was being, and had

been, improperly calculated and reduced by the reduction of production volume and the allocation

of certain costs to it that were not permitted under the Lease or West Virginia law.  The letter

requested that Southern Country be paid all royalties due to it, that the underpayment of its

royalties cease and that it be allowed to conduct an audit of the calculation of its royalties and the

costs allocated to it.  A copy of the March 1, 2021 letter is attached as Exhibit 5.

30.     Tug Hill responded to Southern Country by letter dated April 14, 2021, in which Tug Hill

made the following representations:

> Tug Hill sells its gas to a third-party purchaser as a result of an arms-length
> transaction where title to the gas transfers at the delivery point to that third-party
> purchaser, which is responsible for all downstream matters.  Tug Hill bears all of
> the costs, including marketing fees, incurred in order to deliver the gas to the
> delivery point and does not pass on any of those costs to its royalty owners.
> Accordingly, Tug Hill calculates the royalties under the Lease based on the same
> proceeds that Tug Hill receives from the unaffiliated, third-party purchaser with
> no deductions for the costs incurred by Tug Hill to explore, produce, transport
> and market the gas prior to the point of sale.  Accordingly, Tug Hill's practices
> are consistent with West Virginia law.

31.     Tug Hill's letter blanketly represents - without any equivocation or exception - that *no* post-

production costs are passed on to Southern Country, either directly or indirectly.  The letter

provides no support for this representation, does not identify the third-party purchaser, does not

address whether royalty is paid on the full volume of production and does not respond to Southern

Country's request to conduct an audit.  Tug Hill's letter offers no explanation for the sums of

money that are improperly taken and that which improperly reduce the royalty proceeds realized

by Southern Country and all individuals and legal entities similarly situated.  It does, however,

contend that Tug Hill has the right to deduct post-production costs "at some point in the future" if

it elects to do so, which can be interpreted as an implicit threat to punish Southern Country for seeking information to which it is entitled and demanding the proper calculation of royalties which it is owed.  A copy of the Tug Hill April 14, 2021 letter is attached as Exhibit 6.

**VI.**

**IMPROPER DEDUCTIONS AND CONVERSION**

32.     Under West Virginia law, an oil and gas lessee impliedly covenants to market the oil or gas produced.  The duty to market includes the responsibility to put the product in marketable condition and transport it to the market.  The market is that place where the product can be sold to a willing buyer and title passed to that buyer.

33.     West Virginia law provides that the lessee must bear all costs incurred in exploring for, producing, marketing and transporting the product, unless the lease provides otherwise.

34.     West Virginia law provides that oil and gas leases, and ambiguities in them, are liberally construed in favor of the lessor (Southern Country in this case) and strictly against the lessee (Tug Hill).

35.     West Virginia law provides that language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the market must be specific.  It must expressly provide that the lessor shall bear some of the costs incurred, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.

36.     West Virginia law further provides that a lessee may use lease language to allocate post-production costs against a lessor only if the lessee has actually incurred such costs and they are fair and reasonable.

37.    As noted, in the royalty statements, Tug Hill, and its predecessors, repeatedly represented to Southern Country that it was not charged *any* costs, directly or indirectly, nor was its royalty reduced by *any* costs.  In its April 14, 2021 letter to Southern Country, Tug Hill expressly confirmed and re-stated these representations.

38.    Upon information and belief, Tug Hill, and its predecessors, inexplicably deducted monetary sums and production volumes from Southern Country's royalty contrary to the representations in its royalty statements and its April 14, 2021 letter.  Those deductions are not permitted by the Lease or West Virginia law.

39.    Paragraph 5 of Southern Country's Lease provides for two distinct royalties: (1) a royalty for oil, "including but not limited to distillate and condensate" and (2) a royalty for gas "including casinghead gas and all other gaseous or vaporous substances."

40.    The royalty for oil, distillate and condensate is to be paid based on "the price prevailing in the pricing area for oil of like grade and gravity at the time of delivery" with no deductions for volume or costs permitted.

41.    Despite representing that it has not reduced Southern Country's royalties by any costs, upon information and belief, Tug Hill has improperly taken deductions of monetary sums and volumes and continues to take deductions for costs and volumes in connection with oil, distillates and condensate before calculating Southern Country's royalties.

42.    The royalty for gas is to be paid based on "the market value at the wells."  The term "market value at the wells" does not clarify how market value at the well is to be calculated and is ambiguous, both in fact and under West Virginia law.  Accordingly, it must be construed against Tug Hill.

43.     Despite representing that it has not reduced Southern Country's royalties by any costs, upon information and belief, Tug Hill, and its predecessors, also improperly took, and Tug Hill continues to take, deductions from Southern Country's gas royalties for volumes and costs not identified with particularity in the leases, such as transportation, capacity reservation fees, electricity costs, electricity plant fuel costs, transport fees, fractionization, deethanization and marketing fees.  In the alternative, Southern Country and the putative Class are being deprived of the in-kind value of their oil and gas and associated products.

44.     Further, Tug Hill, and its predecessors, deducted, and Tug Hill continues to deduct, monetary charges from Southern Country's royalties without sufficient proof that such charges were actually incurred and were reasonable.

45.     Upon information and belief, at all relevant times, Tug Hill and its predecessors, controlled and continue to control the extraction and marketing of all oil and gas and associated products under Southern Country's Lease, including costs, production volumes, downstream sales values, and the netting out of such costs in order to arrive at wellhead prices underlying the royalty payments to Southern Country.  As a result, they have had the ability to influence the cost of operations and the effect these costs have on the royalties paid to Southern Country, and to determine the point of sale for the oil and gas produced under Southern Country's Lease and the effect this point of sale has on the royalties paid to Southern Country.  However, their obligation was and is to ensure that the royalties paid to Southern Country reflect the market value of the oil and gas and associated products, regardless of the chosen point of sale.

46.     Tug Hill has represented to Southern Country that it has contracted to sell the production from Southern Country's Lease to an arms-length third party and pay royalties based on the price received from that third party.  Upon information and belief, the price paid to Tug Hill by this third

party does not represent the volumes or market value upon which Southern Country's royalties should have been based.  The price paid by the third party includes downstream costs, such as marketing, gathering, transporting and processing, which Tug Hill represents have not been charged.  These costs are not reflected in the royalty statement sent by Tug Hill to Southern Country.  Upon information and belief, the price paid by the third party is actually calculated by Tug Hill.

47.     Further, upon information and belief, the price paid by the third party, and calculated by Tug Hill, incorporates the reduction of the volume of Liquids produced from Southern Country's Lease paid as a "processing" fee.  In some circumstances, it also incorporates losses due to a de-ethanization fee that, in some months, resulted in a loss on the sale of ethane.  These reductions in Liquids volume and/or the reduction in the market value of the total production from Southern Country's Lease are not reflected in the royalty statements sent by Tug Hill to Southern Country.

48.     Tug Hill's predecessors engaged in the same behavior described above prior to assigning the Southern Country Lease to Tug Hill.  As their successor, Tug Hill is liable to Southern Country for its predecessor's underpayment of royalties and actions that caused damage to Southern Country.

**VIII.**

**FRAUDULENT CONCEALMENT**

49.     By the misleading royalty statements sent to Southern Country and the affirmative statements in Tug Hill's April 14, 2021 letter to Southern Country, Tug Hill, and its predecessors, fraudulently concealed from Southern Country that its royalties are being reduced by volume reductions and costs not allowed under its Lease or by West Virginia law and that its royalties are not being paid on the true market value of the full volume of production from Southern Country's

Lease.  Southern Country reasonably relied on the royalty statements it received from Tug Hill, and its predecessors, as reflecting the true volume and market value of the production from its Lease and the proper calculation of royalties due under the Lease.

50.    Upon information and belief, these misleading representations were intended to prevent Southern Country from learning the truth about the volume reductions and the costs being charged to it and from asserting its rights to receive the proper royalties under its Lease.  If Tug Hill were entitled to charge costs to Southern Country as it contends in its April 14, 2021 letter, there would have been no need to hide the true nature of its transactions with the alleged third-party purchaser.

51.    In addition to damages resulting from its fraudulent concealment, the running of any limitations period against Southern Country and the putative Class should be tolled as a result.

## VIII.

## Class Action Allegations

52.    Southern Country brings this action on behalf of itself and all others similarly situated and is a member of, and seeks to represent, a class of persons and legal entities defined as:

> All lessors to Oil & Gas Leases to which Gastar Exploration USA, Inc., or its affiliates, is or was the lessee covering property located in West Virginia with royalty clauses providing for royalty:
>
> (a) on oil (including but not limited to distillate and condensate) One eighth (1/8) of that produced and saved from the lease premises, the same to be delivered at the wells or to the credit of Lessor in the pipeline to which the wells may be connected, provided; however, Lessee, at its option, may from time to time purchase the royalty oil, paying not less than the price prevailing in the pricing area for oil of like grade and gravity at the time of delivery;
>
> (b) on gas, including casinghead gas and all other gaseous or vaporous substances, produced from the Land and sold or used off the lease premises or in the manufacture of gasoline or in the extraction of sulphur or any other product, the market value at the wells of One-eighth (1/8) of the gas sold or used, with the market value at the wells in no event to exceed the net proceeds received by Lessee calculated or allocated back to the wells from which produced, making

allowance and deduction for a fair and reasonable charge for gathering, compressing, and making the gas merchantable, provided, that on gas sold at the wells, the royalty shall be <u>One-eighth (1/8)</u> of the net proceeds received by the Lessee from the sale, all allowances and deductions, . . . .

Excluded from the Class are:

a.  The officers and directors of any Defendant and their immediate family;

b.  Any judge or judicial personnel assigned to this case and their immediate family; and

c.  Any legal representative, successor or assignee of any excluded person or entity.

Numerosity of the Class

53.    The members of the putative Class are so numerous that joinder of all members is impracticable.  The records of Marshall County, West Virginia alone reflect that Gastar acquired hundreds of oil and gas leases covering property located in West Virginia since 2008.  At least 60 leases, and, upon information and belief, hundreds more, covering thousands of acres contain royalty provisions identical to that in the Southern Country Lease.  Those lessors received the same misleading royalty statements as did Southern Country and were and are subjected to the same deductions, loss of full royalty payments, loss of in-kind value of oil and gas and failure to pay full royalties complained of herein.  The Class Members are identifiable using methods of assessment and/or records maintained in the ordinary course of business by Tug Hill.  Notice may be provided to the Class Members by publication, first-class mail and/or other means.

Commonality

54.    Common questions of law and fact exist as to all Class Members and predominate over questions affecting individual Class Members.  Among the questions of law and fact common to the putative Class are:

a. Whether the royalty statements sent by Tug Hill, and its predecessors, to their lessors were and are misleading;

b. Whether Tug Hill, and its predecessors, sold the production from the subject leases to a true arms-length third party purchaser for a true market value;

c. Whether Tug Hill, and its predecessors, have improperly charged costs to their lessors;

d. Whether Tug Hill, and its predecessors, have taken improper deductions for royalty on oil distillates and condensate;

e. Whether the provision for royalty on gas is ambiguous;

f. Whether Tug Hill, and its predecessors, have taken improper deductions for royalty on gas; and

g. Whether Tug Hill, and its predecessors, have paid royalty on the full volume of oil and gas produced from the leases.

Tug Hill is expected to raise common defenses to these claims.

<u>Typicality</u>

55. The claims of Southern Country are typical of the claims of the Class. Furthermore, the factual bases of Tug Hill's and its predecessors' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the Class. Southern Country has been damaged by the same wrongful conduct of Tug Hill and its predecessors and suffered injuries similar in kind and degree to the injuries suffered by all putative Class Members. Southern Country makes the same claims and seeks the same relief for itself and for all Class Members.

<u>Adequacy of Representation</u>

56. Southern Country will fairly and adequately represent and protect the interests of the Class. Southern Country has retained counsel with substantial experience in prosecuting complex class actions. Neither Southern Country nor its Counsel have interests adverse to those of the Class.

<u>Superiority of Class Action</u>

57.    Absent class treatment, Southern Country and Class Members will continue to suffer harm as a result of Tug Hill's unlawful and wrongful conduct.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights.  Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex cases such as this, few could or would likely seek their rightful legal recourse.  Absent a class action, Class Members will continue to incur harm without remedy.

58.    Moreover, prosecuting separate actions by individual Class Members would create a risk of (A) inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Tug Hill and/or (B) adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

59.    Southern Country knows of no difficulty that will arise in the management of this litigation that would preclude its maintenance as a class action.

60.    Tug Hill has acted, or refused to act, on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## IX.

## PRE-SUIT NOTICE

61.    The Southern Country Lease contains a notice provision which provides in relevant part:

> Breach or Default.  In the event Lessor considers that Lessee has not complied with the express or implied obligations of this Lease, Lessor shall notify Lessee in writing of the facts relied on as constituting a breach of the obligations.  Lessee shall then have sixty (60) days after receipt of that notice within which to meet or commence to meet all or any part of the breaches alleged by Lessor.  The service of the notice shall be precedent to the bringing of any action by Lessor for any cause, and no action shall be brought until the lapse of sixty (60) days after service of the notice on Lessee....

62.     Without conceding the enforceability of this provision, Southern Country served Tug Hill with written notice of its breaches by letter dated March 1, 2021.  See Exhibit 5.  As noted, Tug Hill replied by letter dated April 14, 2021.  See Exhibit 6.  In its reply letter, Tug Hill takes the position that it has paid the proper amount of royalties, it has not charged any costs, directly or indirectly, to Southern Country and that it is entitled to charge some costs if it decided to do so.

63.     Assuming the leases given by the putative Class Members contain a similar provision and the provision is enforceable, it is not necessary for the Class Members to provide such notice to Tug Hill as it would be a vain and useless act not required by the law.  Tug Hill has already denied the same claims as set out in Southern Country's notice to Tug Hill.

## X.

## CAUSES OF ACTION

### Count I

### Breach of Contract

64.     Southern Country incorporates the preceding paragraphs of this Complaint as though fully stated here.

65.     Tug Hill, and its predecessors, deducted and Tug Hill continues to deduct from Southern Country's royalties, and the royalties of the putative Class, amounts not permitted by its Lease.

Tug Hill, and its predecessors, also failed to pay royalties for significant volumes of oil, gas and associated products taken from Southern Country's leasehold and that of the putative Class.

66.    Tug Hill, and its predecessors, materially breached their lease obligations to Southern Country, and the putative Class, including express and implied covenants, including, but not limited to, the following:

a.    Failing to disclose and/or providing inaccurate and misleading information about the gathering, transporting, processing and selling of oil, gas and associated products produced under Southern Country's Lease and the leases of the putative Class members;

b.    Failing to sell the gas, as defined by the gas royalty clause of the Southern Country Lease, to a true third-party in an arms-length transaction;

c.    Failing to sell the oil, distillates condensate and distillate, as defined by the oil royalty clause of the Southern Country Lease, at the price prevailing in the pricing area for oil of like grade and gravity at the time of delivery;

d.    Taking significant volumes of oil, gas and associated products produced under Southern Country's Lease and the leases of the putative Class members without paying royalties on them;

e.    Improperly deducting costs on oil, gas and associated products produced under Southern Country's Lease and the leases of the putative Class members from royalties paid under those leases;

f.    Failing to pay royalties on the oil, gas and associated products produced under Southern Country's Lease and the leases of the putative Class members based upon the true market value of such production;

g. Failing to sell the oil, gas and associated products produced under Southern Country's Lease and the leases of the putative Class members and pay royalties on such production in a manner consistent with the lease(s), the reasonably prudent operator standard and West Virginia Law; and

h. Other breaches as will be shown at the trial of this matter.

67.    Southern Country, and the putative Class, has sustained and continues to sustain pecuniary loss due to these breaches.

68.    Southern Country, and the putative Class, has complied with every element of their respective contractual obligations, implied or express.

69.    Southern Country, and the putative Class, is entitled to Tug Hill's performance of express contractual obligations and implied covenant obligations.

70.    Tug Hill's and its predecessors' breaches of contractual obligations, singularly and/or in any combination, have caused significant financial damages to Southern Country, and the putative Class, and/or conferred unjust and unearned benefits on Tug Hill.  Southern Country, on behalf of itself and the putative Class, now seeks all damages to which it, and the putative Class members, are entitled, including consequential and incidental damages, lost profits, out-of-pocket losses, compensatory, punitive and future damages.

**WHEREFORE**, Southern Country, and the putative Class, demands judgment in an amount to be determined along with all other appropriate damages in law or equity, including pre-judgment interest, post-judgment interest, compensatory damages, punitive damages and attorneys' fees.

## Count II

## __Misrepresentation__

71.    Southern Country incorporates the preceding paragraphs of this Complaint as though fully stated here.

72.    Tug Hill, and its predecessors, negligently or fraudulently misrepresented material facts to Southern Country, and the putative Class, including, but not limited to, the following:

a. Representing that the sale prices reflected in its royalty statements were the true market value of the oil, gas and associated products produced under Southern Country's Lease and the leases of the putative Class members;

b. Representing that the volumes of oil, gas and associated products reflected in its royalty statements were the total volumes produced under Southern Country's Lease and the leases of the putative Class members upon which royalty payments were based;

c. Representing that no costs were charged before calculating royalties owed under the leases

d. Failing to explain the monetary reductions in the royalty proceeds realized by Southern Country and all individuals and legal entities similarly situated;

e. Representing that the oil, gas and associated products produced under Southern Country's Lease and the leases of the putative Class members was sold to  a true third-party in an arms-length transaction; and

f. Other misrepresentations as will be shown at the trial of this matter.

73.    Southern Country, and the putative Class, reasonably and justifiably relied on these misrepresentations to their detriment and were damaged by these misrepresentations.  Southern

Country, and the putative Class, believed they were receiving proper royalties as a result of these misrepresentations when they were not and they were damaged as a result.

**WHEREFORE**, Southern Country, and the putative Class, demands judgment in an amount to be determined along with all other appropriate damages in law or equity, including pre-judgment interest, post-judgment interest, compensatory damages, punitive damages and attorneys' fees.

### Count III

### <u>Unjust Enrichment and Conversion</u>

74.     Southern Country incorporates the preceding paragraphs of this Complaint as though fully stated here.

75.     Tug Hill, and its predecessors, are liable under a theory of unjust enrichment to the extent they received and retained funds and production volumes that were improperly diverted or otherwise excluded from Southern Country's royalties, and the royalties of the putative Class, as set forth above.

76.     Tug Hill, and its predecessors, are also liable under a theory of conversion because it has taken oil and gas and related products from Southern Country's property, and the property of the putative Class and used it for its own purposes without consent or payment.

77.     Tug Hill, and its predecessors, accepted full control and custody of these products and funds.

78.     Tug Hill, and its predecessors, had no legal right or ability to take legal possession or control of these funds or the products in the manner described herein.

79.     Because of the conduct of Tug Hill, and its predecessors, in intentionally taking the property of Southern Country and the putative Class, Southern Country and the putative Class, had no use of their property and therefore suffered damages.

80.     Southern Country, and the putative Class, has been injured to the extent Tug Hill, and its predecessors, received and retained funds and/or production volumes that were improperly diverted or excluded from royalties due to Southern Country and the putative Class.

81.     It is inequitable for Tug Hill to receive and/or retain funds and/or production volumes that were improperly diverted or excluded from royalties owed to Southern Country and the putative Class.

82.     It is unconscionable for Tug Hill, and its predecessors, to receive and/or retain funds that were improperly diverted or excluded from royalties due to Southern Country and the putative Class.

83.     To the extent Tug Hill, and its predecessors, received or retained funds and/or production volumes that were improperly diverted or excluded from royalties due to Southern Country, and the putative Class, Tug Hill, and its predecessors, have been unjustly enriched and is liable to Southern Country and the putative Class.

84.     Tug Hill's conduct as alleged herein was done in a willful and wanton manner intentionally calculated to cause harm to Southern Country and the putative Class.

**WHEREFORE**, Southern Country, and the putative Class, demands judgment in an amount to be determined along with all other appropriate damages in law or equity, including pre-judgment interest, post-judgment interest, compensatory damages, punitive damages and attorneys' fees.

## Count IV

## Accounting

85.     Southern Country incorporates the preceding paragraphs of this Complaint as though fully stated here.

86.     Southern Country, and the putative Class, are entitled to an accounting from Tug Hill of:

a. All volumes of oil, gas and associated products produced from its and the putative Class' leases;

b. The manner and contractual arrangements by which such production was marketed and sold;

c. The manner in which the market value of such production was calculated for royalty purposes;

d. All costs charged to the royalty owners, directly and indirectly;

e. The volumes of such production upon which royalty was paid;

f. All other matters to which Southern Country, and the putative Class, are entitled to an accounting under their leases and West Virginia law.

**WHEREFORE**, Southern Country, and the putative Class, demands an accounting as specified herein.

## Count V

### Declaratory Judgment and Injunctive Relief

87.     Southern Country incorporates the preceding paragraphs of this Complaint as though fully stated here.

88.     In its letter to Southern Country dated April 14, 2021, Tug Hill contends it is entitled to deduct certain unspecified costs from Southern Country's royalties while claiming to not have done so.  Southern Country, and the putative Class, will incur additional damages into the future unless Tug Hill is compelled to cease making illegal deductions from Southern Country's royalties and to pay royalties on the full volumes of oil, gas and associated products produced from its and the putative Class' leases and a declaratory judgment is issued that Tug Hill is not entitled to reduce the production volume and/or deduct the costs described herein from Southern Country's royalties under the terms of the Leases.

89.     This controversy is ripe for adjudication.

90.    Southern Country, on behalf of itself and the putative Class, seeks a declaratory judgment that under the oil and gas leases at issue:

a. Deductions of costs taken by Tug Hill from royalties due on oil, including distillates and condensate, are not permitted;

b. The royalty provision for gas is ambiguous.

c. The royalty provision for gas does not allow for deductions of costs taken by Tug Hill;

d. Tug Hill's, and its predecessors', deductions of costs from royalties due on oil, including distillates and condensate, and gas constitute breaches of the leases;

e. The contractual arrangements entered into by Tug Hill, and its predecessors, have the effect of lowering the market value of the oil and gas produced from the leases at issue by imposing various costs on the lessors and reducing the volume of production, thus lowering the royalties due in breach of the leases;

f. The Lessors are entitled to royalty on the full volume of oil, gas and associated products produced under the leases at issue, including any in-kind payments made for processing or other post-production costs, and failure to pay royalty on the full amount of oil, gas and associated products produced under the leases constitute breaches of the leases; and

g. All other declaratory relief to which Southern Country, and the putative Class, is entitled.

91.    Southern Country, on behalf of itself and the putative Class, also seeks the following injunctive relief:

h. Enjoining Tug Hill from deducting the costs taken by Tug Hill from royalties due on oil, including distillates and condensate, under the leases at issue;

i. Enjoining Tug Hill from lowering the market value of the oil and gas produced from the leases through non-third party and non-arms-length contractual marketing and processing arrangements;

j. Ordering Tug Hill to pay royalty on the full volume of oil, gas and associated products produced under the leases, including any in-kind payments made for processing or other post-production costs; and

k. All other injunctive relief to which Southern Country, and the putative Class, is entitled.

## XI.

## <u>LIABILITY FOR ITS PREDECESSOR'S ACTIONS</u>

92.     Tug Hill's predecessors engaged in the same behavior described herein prior to assigning the Southern Country Lease to Tug Hill.  Tug Hill also acquired numerous other leases in West Virginia from these same predecessors.  As their successor, Tug Hill is liable to Southern Country, and the putative Class, for its predecessors' underpayment of royalties and actions that caused damage to Southern Country, and the putative Class.

## XII.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Southern Country, and the putative Class, demands judgment in its favor for:

A. An Order certifying the class proposed by Southern Country, naming Southern Country as class representative, and appointing Southern Country's counsel as class counsel;

B. Past due royalties owed under the terms of Southern Country's Lease and the leases of the putative Class;

C. Damages for breach of Southern Country's Lease and the leases of the putative Class;

D. Damages for Tug Hill's misrepresentations;

E. Damages for Tug Hill's unjust enrichment and conversion;

F. An accounting as prayed for herein;

G. Declaratory relief as prayed for herein;

H. Injunctive relief as prayed for herein;

I. Punitive Damages as allowed by law;

J. Pre-judgment and post-judgment interest as allowed by law;

K. Any and all other relief this Court deems appropriate and to which Southern Country, and the putative Class, are entitled, including attorney's fees.

Southern Country asserts its right to a JURY for all issues.

01001103-1

PLAINTIFFS
By Counsel

/s/ Mark A. Kepple
Mark A. Kepple, Esq.
Bailey & Wyant, P.L.L.C.
W.Va. Bar ID #7470
1219 Chapline Street
Wheeling, WV 26003
Phone (304)233-3100
Fax (304) 233-0201
mkepple@baileywyant.com
http://www.baileywyant.com

/s/ Thomas E. White
Thomas E. White, Esq.
W.Va. Bar ID # 4022
White Law Offices
 604 6th St,
Moundsville, WV 26041
(304)845-7008
Twhite@white-law.com

Robert L. Redfearn, Esq.
LA Bar Id # 11418
robertr@spsr-law.com
Robert L. Redfearn, Jr. Esq.
LA Bar Id # 17106
robertjr@spsr-law.com
Simon, Peragine, Smith & Redfearn
1100 Poydras St. #3000
New Orleans, LA 70163
http://www.spsr-law.com
Phone: 504-569-2994
Fax: 504-569-2999

(Pending pro hac vice admission)